# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01477-COA

**EMMA BELL AND JOHN BELL**  **APPELLANTS**

**v.**

**CERTAIN UNDERWRITERS AT LLOYD'S**  **APPELLEES**
**LONDON, SUBSCRIBING TO POLICY**
**NUMBER - TCN034699, SOUTHGROUP**
**INSURANCE AND FINANCIAL SERVICES, LLC**
**AND TAPCO UNDERWRITERS, INC.**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/11/2014 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | CLAIBORNE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ALTON EARL PETERSON |
| | LARRY STAMPS |
| ATTORNEYS FOR APPELLEES: | JASON BROOKS PURVIS |
| | DAVID A. BARFIELD |
| | LARA A. COLEMAN |
| NATURE OF THE CASE: | CIVIL - TORTS - OTHER THAN PERSONAL INJURY AND PROPERTY DAMAGE |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' MOTIONS FOR SUMMARY JUDGMENT |
| DISPOSITION: | AFFIRMED - 08/23/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ISHEE AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     Emma Bell ("Emma") and her husband, John Bell ("John"), filed suit against Certain

Underwriters at Lloyd's London ("Underwriters"), TAPCO Underwriters Inc. ("TAPCO"),

and SouthGroup Insurance and Financial Services ("SouthGroup") after Underwriters denied

Emma's claim for property damage related to the collapse of a barn on her land in Port

Gibson. Underwriters denied the claim because it concluded that Emma's insurance policy covered only a smaller building on the property and not the barn. Emma disagrees and alleges that Underwriters denied her claim in bad faith. She also alleges that, if the barn is not covered, then the defendants negligently or fraudulently misrepresented that it was or negligently failed to obtain coverage for it. The circuit court ruled that the plain language of the policy covered only the smaller building, not the barn, and that this would have been apparent to the Bells had they ever read the policy. Accordingly, the court granted summary judgment in favor of all defendants. For the reasons explained below, we agree and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. In April 2011, Emma purchased a property in Port Gibson on which two buildings were located: (1) a wood-framed barn that measured approximately 6,000 to 8,000 square feet, and (2) about three feet away from the barn, a metal building that measured approximately 900 to 1,100 square feet. The barn did not have plumbing or electricity, whereas the metal building did. John subsequently rented the metal building to a woman who used it as a yoga or exercise studio.

¶3. In August 2011, John called Lem Montgomery at SouthGroup about obtaining insurance for the property. Montgomery prepared an application for Emma, and she signed it, although the Bells testified that neither of them read the application. Emma's application sought coverage for one building, a 900 square foot "ALL STEEL" building. The application represented that the building would be used as an "EXERCISE CENTER-YOGA, PILATES, ETC." The application further stated that the building was built in 1966 and that

2

plumbing, wiring, and heating systems were installed at a later date.

¶4.     SouthGroup obtained insurance for the Bells from TAPCO under a policy issued by Underwriters.  In relevant part, the policy defines the "Covered Property" as "the building or structure described in the Declarations."  The Declarations identify a "ONE STORY STEEL BUILDING" to be used as a "YOGA/PILATES STUDIO."  The property was insured at a replacement cost of $75,000.  The Bells testified that they did not read the policy.

¶5.     In May 2012, the barn collapsed during high winds, and Emma made a claim under her policy.  Underwriters sent a third-party adjuster to the site within days.  The adjuster documented that the barn appeared to be a total loss and estimated that its replacement cost would be in excess of $150,000; however, the adjuster also noted that another building on the premises—the yoga studio—was still standing, appeared to be around 900 square feet, was "not attached to" the barn, and appeared to be about fifty years old.  The adjuster suggested that this seemed to match the description of the insured building.

¶6.     Underwriters also retained a forensic engineer, Charles Rutter, to review the claim and investigate the cause of the collapse.  Rutter visited the site on June 13, 2012.  He noted that the barn was built around 1948.  He also noted that the metal building was located thirty-three inches from the barn's foundation.  A door on the metal building lined up with a door on the collapsed barn; however, there was "[n]o evidence of fasteners or framing . . . to indicate that the metal building and barn were connected."  Rutter therefore concluded that the metal building was "an independent structure" and "was not part of the collapsed structure."  On October 4, 2012, Underwriters denied Emma's claim on the ground that the

3

policy covered only the smaller metal building, not the barn.

¶7.     Montgomery subsequently asked Underwriters to reconsider its decision denying coverage.  In a March 2013 email, Montgomery stated that John had requested a policy covering both the barn and the yoga studio, which John maintained were connected and a single building.  Montgomery stated that John told him that the combined building was "around 9000 square feet" and that the 900 square feet reflected in the application was a typo by Montgomery.  Montgomery also stated that, based on his prior experience with John, he did not believe that John would have insured the yoga studio alone for $75,000.

¶8.     In response to Montgomery's request, Underwriters reopened its investigation of the claim, and on April 5, 2013, their attorney requested that Emma submit to an "examination under oath" ("EUO") in accordance with the terms of the policy.  On April 16, 2013, the Bells filed suit against Underwriters, TAPCO, and SouthGroup in the Circuit Court of Claiborne County.  Their complaint asserted claims for fraud, tortious breach of contract, bad faith, and negligence.  Through their attorney, the Bells rejected Underwriters' request for an EUO and stated that Emma would agree to a deposition instead.

¶9.     In her deposition, Emma testified that there were "[t]wo separate buildings" on her property—"a big one [(the barn)] and a little one [(the steel building)]"—and that the two buildings were "not connected."  The county tax assessor's records also identified two separate buildings on the property.  Emma knew little else about the buildings or the insurance policy.  She testified that John called Montgomery about coverage and that she signed the application but never read it or her policy.

4

¶10.    In his deposition, John claimed that the barn and yoga studio constituted a single building and that a door of the metal building was connected by an enclosed, unfinished walkway to a facing door of the barn. John testified that he removed all of the debris from the walkway after the barn collapsed, although he left the debris from the barn where it fell. John also testified that he did not tell Montgomery anything about the square footage of the buildings because he "didn't even know." He testified that he did not mention 900 square feet or 9,000 square feet or any other number to Montgomery.

¶11.    On July 1, 2014, Underwriters and TAPCO filed a motion for summary judgment, arguing, inter alia, that the barn was not covered by the policy; that the Bells were charged with knowledge of the contents of the application and policy; that there was no evidence that the defendants failed to investigate the claim properly; and that the Bells' claims were barred because of Emma's refusal to submit to an EUO. Underwriters and TAPCO requested that the court enter summary judgment in favor of all defendants (including SouthGroup) on all claims or, alternatively, enter summary judgment as to the claims against them.

¶12.    By order entered on August 29, 2014, the circuit court ruled that the "[d]efendants [were] entitled to judgment as a matter of law" and granted Underwriters'/TAPCO's motion for summary judgment. The court's order did not specify whether it applied to the Bells' claims against SouthGroup. On September 8, 2014, the circuit court entered a "Rule 54(b) Final Judgment" based on its prior summary judgment ruling. The judgment stated, "Final Judgment pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure should be and hereby is entered." The court's apparent intent was to certify final judgment as to all claims

5

against Underwriters and TAPCO, but the record contains no Rule 54(b) determination or other explanation of the reason for doing so. Finally, on September 17, 2014, the circuit court entered an order "clarifying" its prior order granting summary judgment and ruling that all defendants, including SouthGroup, were entitled to summary judgment on all claims. The court explained that Emma had an obligation to read her policy and application; that the policy clearly covered only the smaller steel building and not the barn; and, therefore, that it would have been unreasonable to rely on any representations to the contrary. The Bells filed a notice of appeal on October 14, 2014.

**DISCUSSION**

¶13.    On appeal, the Bells argue that genuine issues of fact exist as to whether the barn was covered by Emma's policy and whether Underwriters conducted an adequate investigation, and they contend that Emma's failure to read her application and policy does not defeat their claims. Underwriters and TAPCO respond that the Bells failed to file a timely notice of appeal, that summary judgment was proper, and that the Bells' claims also could have been dismissed based on Emma's refusal to submit to an EUO.[1] SouthGroup also argues that the Bells' failure to comply with the circuit court's pretrial orders is an alternative ground for affirmance. For the reasons that follow, we conclude that the Bells' appeal was timely and that the circuit court correctly entered summary judgment in favor of all defendants. Because we affirm the circuit court for essentially the reasons stated in its final order on summary judgment, we do not address the defendants' alternative arguments for affirmance.

---

[1] *See Taylor v. Fireman's Fund Ins.*, 306 So. 2d 638, 644-45 (Miss. 1974); *U.S. Fid. & Guar. Co. v. Wigginton*, 964 F.2d 487, 490 (5th Cir. 1992).

6

## I. The Bells Filed a Timely Notice of Appeal

¶14.    Underwriters'/TAPCO's argument that the Bells' notice of appeal was not timely is twofold.  First, with respect to the circuit court's entry of summary judgment on the Bells' claims against them, they argue that the Bells were required to file a notice of appeal within thirty days of the circuit court's "Rule 54(b) Final Judgment."  However, the circuit court's purported "Final Judgment" did not satisfy the requirements of Rule 54(b) and so was not, in fact, a final and appealable judgment.  In particular, the circuit court did not make "an expressed determination that there was no just reason for delay."  M.R.C.P. 54(b); *Anderson v. Britton & Koontz Bank N.A.*, 55 So. 3d 1130, 1132 (¶7) (Miss. Ct. App. 2011); *Jennings v. McCelleis*, 987 So. 2d 1041, 1042 (¶7) (Miss. Ct. App. 2008).  Nor does the record provide any other explanation as to the reasons for the court's entry of final judgment under Rule 54(b).  Therefore, although the time for taking an appeal begins to run on the date of a proper certification of a final judgment under Rule 54(b), *see Calvert v. Griggs*, 992 So. 2d 627, 631-32 (¶10) (Miss. 2008), the purported Rule 54(b) judgment in this case was not properly certified and, therefore, did not trigger the thirty-day period for an appeal.

¶15.    Underwriters and TAPCO also argue that the Bells' notice of appeal was filed more than thirty days after the circuit court "entered" final judgment as to all defendants.  However, Underwriters and TAPCO have confused the date on which the judgment was signed with the date on which it was *entered*.  "Except as [otherwise] provided . . . the notice of appeal . . . shall be filed with the trial court clerk within 30 days after the date of *entry* of the judgment or order appealed from."  M.R.A.P. 4(a) (emphasis added).  "The date of entry

of judgment is the date the judgment is entered in the general docket of the clerk of court." *Id.*, cmt.; *see* M.R.C.P. 58 & 79(a); *Smith v. Parkerson Lumber Inc.*, 890 So. 2d 832, 834-36 (¶¶12-19) (Miss. 2003). Here, the final judgment was signed on September 11, 2014, but it was not entered on the docket until September 17, and the Bells then filed a timely notice of appeal on October 14. Accordingly, we have jurisdiction of the appeal.

## II.     The Circuit Court Properly Granted Summary Judgment

¶16.     We review the circuit court's grant of summary judgment de novo. *Hayne v. The Doctors Co.*, 145 So. 3d 1175, 1180 (¶10) (Miss. 2014). Summary "judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party, *Forbes v. Gen. Motors Corp.*, 993 So. 2d 822, 824 (¶7) (Miss. 2008), but a non-moving "party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." M.R.C.P. 56(e). This case primarily involves the proper interpretation of an insurance policy, which is a question of law also subject to de novo review. *Hayne*, 145 So. 3d at 1180 (¶10).

¶17.     "The language and provisions of insurance policies are viewed as contracts and are subject to the same rules of interpretation as other contracts." *Id.* at (¶12). "The analysis must begin with the language of the policy, which 'either affords coverage or not, based upon

application of the policy language to the facts presented.'" *Id.* (quoting *Hankins v. Md. Cas. Co./Zurich Am. Ins.*, 101 So. 3d 645, 653 (¶18) (Miss. 2012)). "Because insurance policies are creatures of contract, if the language is clear and unambiguous, then the language of the policy must be interpreted as written." *Id.*

¶18.    In this case, the circuit court correctly concluded that the plain language of the policy covered only the smaller steel building, not the barn. The Bells point to nothing in their policy that suggests otherwise. The policy and application[2] consistently describe a 900 square foot all steel building, with electricity and plumbing, to be used as a yoga or exercise studio. The barn was several times that size, had a wood frame, lacked electricity and plumbing, and indisputably was never used as a yoga or exercise studio. The application and policy both permitted the listing of multiple buildings, but neither identified the barn. Even Emma, the owner of the property and the policy, recognized that the smaller steel building and the barn were separate buildings, as did the county tax assessor. John insists that these two very different structures were actually a single, integrated building because they were connected by a covered walkway. But the mere fact that there is a walkway between two buildings does not make them one building. Nor can John's subjective belief in the buildings' oneness overcome the plain language of the policy, which inescapably describes the smaller steel building, not the barn. The circuit court correctly concluded that there was

---

[2] Under Mississippi law, "the application attached to or giving rise to an insurance policy is a part of the insurance contract, and the policy should be construed together with the application." *Provident Life & Acc. Ins. v. Goel*, 274 F.3d 984, 993 (5th Cir. 2001) (alteration omitted) (quoting Keith A. Rowley, *Contract Construction and Interpretation: From the "Four Corners" to Parol Evidence (And Everything in Between)*, 69 Miss. L.J. 73, 181 (1999)).

no coverage under the policy.

¶19. The circuit court also correctly concluded that the Bells' claims for negligence and fraud were precluded by their failure to read the policy. "[The Supreme] Court has held as a matter of law that an insured is charged with the knowledge of the terms of the policy upon which he or she relies for protection." *Robichaux v. Nationwide Mut. Fire Ins.*, 81 So. 3d 1030, 1041 (¶31) (Miss. 2011) (quoting *Mladineo v. Schmidt*, 52 So. 3d 1154, 1161 (¶26) (Miss. 2010)). This is known as the "duty to read" or "imputed knowledge" doctrine, and it is "firmly rooted in Mississippi precedent." *Mladineo*, 52 So. 3d at 1162 (¶26). Here, as discussed above, "the [Bells] could have ascertained that [the] policy did not cover [the barn] by simply reading their policy." *Robichaux*, 81 So. 3d at 1041 (¶31). Accordingly, the Bells "are imputed with knowledge" that Emma's policy did not cover the barn. *Id.* It follows that their negligence claim fails as a matter of law because "the proximate cause of their damage" was their own failure to "execute[] their duty to read the policy," not Montgomery's alleged negligence in procuring it. *Mladineo*, 52 So. 3d at 1164 (¶38). Likewise, any claim for fraudulent or negligent misrepresentation fails as a matter of law because the Bells could not have reasonably relied on an assurance of coverage "that directly contradicted the plain language of the policy they had in their possession." *Id.* at 1166 (¶47).[3]

---

[3] In arguing that they should not be bound by the plain language of Emma's policy, the Bells rely on cases such as *Home Ins. Co. of New York v. Thornhill*, 165 Miss. 787, 144 So. 861, 862 (1932), and *Pongetti v. First Cont'l Life & Accidental Co.*, 688 F. Supp. 245, 247 (N.D. Miss. 1988). However, the issue addressed in those cases was whether the insurer could void the policy because of material misrepresentations in the policy application. When the insurer raises such a defense, the insured may attempt to prove that she provided the insurer with accurate information, which the insurer's agent transcribed incorrectly. In this case, Underwriters does not seek to void the policy based on any alleged misrepresentation;

¶20.   Finally, we note that the defendants were entitled to summary judgment as to any bad faith claim because "[a]n insured seeking to recover on a claim of bad faith must first establish the existence of coverage on the underlying claim." *Stubbs v. Miss. Farm Bureau Cas. Ins.*, 825 So. 2d 8, 13 (¶18) (Miss. 2002); *see Essinger v. Liberty Mut. Fire Ins.*, 529 F.3d 264, 271 (5th Cir. 2008); Jeffrey Jackson & Jason Childress, *Mississippi Insurance Law and Practice* §§ 13:2 & 13:3 (2015).[4]  Because no claim was owed under the policy, there can be no bad-faith denial of the claim.

**CONCLUSION**

¶21.   The circuit court properly granted summary judgment to all defendants because the plain language of Emma's policy did not provide coverage for the barn.  Therefore, we affirm.

¶22.   **THE JUDGMENT OF THE CIRCUIT COURT OF CLAIBORNE COUNTY IS AFFIRMED.    ALL  COSTS  OF  THIS  APPEAL  ARE  ASSESSED  TO  THE APPELLANTS.**

   **LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR.  JAMES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

---

rather, it seeks to enforce the policy according to its plain language.  This situation is governed by the duty-to-read cases discussed in the text.

   [4] The treatise notes a possible exception to this rule if an insurer denies a claim without articulating an arguable basis for the denial but subsequent investigation reveals facts that negate coverage.  *See* Jackson & Childress, *supra*, §§ 13:3 n.4 & 13:7.  Here, however, the claim was properly denied because of information apparent when the claim was denied, i.e., the plain language of the policy did not cover the barn.